# UNITED STATES DISTRICT COURT

for the

Central District of California

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Manuel Orlando ARGUETA, 25 years old, approximately 5'9," with black hair and brown eyes

)
)
)
)
)
)

Case No.  2:20-mj-00928

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2

located in the _____ Central _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2252A(a)(2); 2252A(a)(5)(B) | receipt and distribution of child pornography; possession of child pornography |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Brittany Radke, Special Agent - FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Michael R. Wilner, Magistrate Judge
*Printed name and title*

AUSA: Billy Joe McLain, (213) 894-6702

### <u>AFFIDAVIT</u>

I, Brittany Radke, being duly sworn, declare and state as follows:

### I.   <u>INTRODUCTION</u>

1.     I am a Special Agent of the Federal Bureau of Investigation ("FBI"), and have been so employed since January 2019.   I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for federal offenses. I am currently assigned to the Los Angeles Division, Long Beach Resident Agency, Counterintelligence squad.  I investigate a variety of criminal and national security matters.

2.     During my time at the FBI Academy I received training on cyber and computer-based criminal offenses, including the use of IP addresses to determine the possible location and identity of a subject.  Since graduating from the FBI Academy in May 2019, I have investigated child exploitation cases alongside other FBI Agents, as well as state and local law enforcement officials who specialize in investigating this type of offense.  During these investigations I have become familiar with how people involved in the sexual exploitation of children use digital devices and the Internet to further those offenses.  Through my training and experience, I have become familiar with the methods of operation used by people who are involved with offenses relating to the sexual exploitation of children.

### II.   <u>PURPOSE OF AFFIDAVIT</u>

3.     This affidavit is made in support of an application for a warrant to search the (1) the premises located at 7818 Adwen Street, Downey, California 90044 (the "SUBJECT PREMISES"), more fully described in Attachment A-1; and (2) the person of Manuel Orlando Argueta ("ARGUETA"), more fully described in Attachment A-2, for evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child

pornography), and 2252A(a)(5)(B) (possession of child pornography) (the "Subject Offenses"), as described more fully in Attachment B.

4.      The statements in this affidavit are based upon my personal observations, my training and experience, my investigation of this case, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are relayed in substance and in part only.

## III.   BACKGROUND ON COMPUTER USE, CHILD PORNOGRAPHY, AND THE USE OF YAHOO! AS A MEANS FOR SHARING CHILD PORNOGRAPHY

5.      In this affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256. The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

6.      Based upon my training and experience in the investigation of child pornography offenses, and information related to me by FBI agents and/or law enforcement officers with several years of experience investigating child pornography and cyber crimes, I know the following information about the use of computers with respect to child pornography:

a.      Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  Child pornographers can now produce both still and moving images directly from a common video camera and can convert these images into computer-readable formats.  The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

b.       Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage").  Computer users frequently transfer files from one location to another, such as from a phone to a computer or from cloud storage to an external hard drive.  Computer users also often create "backup," or duplicate, copies of their files.  In this way, digital child pornography is extremely mobile and such digital files are easily reproduced and transported.  For example, with the click of a button, images and videos containing child pornography can be put onto external hard drives small enough to fit onto a keychain.  Just as easily, these files can be copied onto compact disks and/or stored on mobile digital devices, such as smart phones and tablets.  Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device.  Therefore, viewing this child pornography would require a computer, smartphone, tablet, or some other digital device that allows the user to access and view files on the Internet.

c.       The term "Internet" is defined as the worldwide network of computers -- a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide.  The Internet is not an online service and has no real central hub.  It is a collection of tens of thousands of computer networks, online services, and single user components.  In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

d.      Individuals and businesses obtain access to the Internet through Internet ISPs.  ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customer's behalf; and may provide other services unique to each particular ISP.  ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them.  Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, and other information both in computer data and written record format.

e.      An Internet Protocol address ("IP Address") is a unique numeric address used to connect to the Internet.  An IPv4 IP Address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  In simple terms, one computer in a home may connect directly to the Internet with an IP Address assigned by an ISP.  What is now more typical is that one home may connect to the Internet using multiple digital devices simultaneously, including laptops, tablets, smart phones, smart televisions, and gaming systems, by way of example.  Because the home subscriber typically only has one Internet connection and is only assigned one IP Address at a time by their ISP, multiple devices in a home are connected to the Internet via a router or hub.  Internet activity from every device attached to the router or hub is utilizing the same external IP Address assigned by the ISP.  The router or hub "routes" Internet traffic so that it reaches the proper device.  Most ISPs control a range of IP Addresses. The IP Address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP Address is only assigned for the

duration of that online session.  Most ISPs maintain records of which subscriber was assigned which IP Address during an online session.

f.     Due to the limited number of available IPv4 IP addresses, a new protocol was established using the hexadecimal system to increase the number of unique IP addresses. An IPv6 consists of eight sets of combination of four numbers 0-9 and/or letters A through F. An example of an IPv6 IP address is 2001:0db8:0000:0000:0000:ff00:0042:8329.

g.     ISPs of e-mail and/or social media services, such as Yahoo!, offer a variety of online services to the public.  Subscribers obtain an account by registering with the provider.  During the registration process, providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail or social media account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  Some providers also maintain a record of changes that are made to the information provided in subscriber records, such as to any other e-mail addresses or phone numbers supplied in subscriber records.

h.     A subscriber of Yahoo! can also store with Yahoo! files in addition to e-mails or other messages, such as address books, contact or buddy lists, calendar data, pictures or photos or videos (other than ones attached to e-mails), notes, and other files, on servers maintained and/or owned by Yahoo!.  Yahoo! allows up to one terabyte of free storage online.

## IV.  STATEMENT OF PROBABLE CAUSE

7.     Based on my review of reports and documents from Yahoo! and FBI agents, subpoena returns, images, records from law enforcement databases, and the California DMV, as well as my conversations with other FBI agents involved in the investigation of this case, I know the following:

      a.      On February 27, 2020, I reviewed a Cybertip report and associated files that had been sent from Yahoo! to the National Center for Missing and Exploited Children ("NCMEC") on October 17, 2019 (the "Report").[1]   According to the Report, the Yahoo! user id "DGRSEBRO2B3CNB4U6ABLXYWVKY" uploaded about 70 files to a Yahoo! account (the "Subject Account") that Yahoo! identified as child sexual exploitative material.  I reviewed these 70 files on February 27, 2020 and confirmed all of them included content relating to the sexual exploitation of children.

      i.      For example, the following files – "image.4-1.jpeg," "image.6-1.jpg," image.8.1.jpg," "image.16-1.jpg," "image.18-1.jpg" and "image.20-1.jpg" – are a series of images depicting a minor child who appears to be under ten years old and is naked.  In some of the images, his arms or legs are bound and/or a gag is in his mouth.  In one image, his erect penis is visible and in another image a foreign object is inserted into his anus.

      ii.      As another example, "video.976-1.mp4" depicts two naked, minor males who appear to be under 13-years old.  The video shows one minor male orally copulating and fondling the penis of the other minor male.

      b.      According to the Report, the name associated with the Subject Account was ARGUETA, and the following information was also provided:

- Login ID(s): margueta_m2
- GUID: DGRSEBRO2B3CNB4U6ABLXYWVKY
- Mail Name: margueta_m2@yahoo.com
- Account Status: terminated[2]
- Registration IP Address: 69.226.40.115

---

[1] The Report was dated October 17, 2019 and came from Oath Holdings, Inc., which was formerly Yahoo! Holdings, Inc.

[2] Based on my experience and communications with other law enforcement agents who investigate child exploitation cases, Yahoo! typically terminates an account after identifying sexually exploitative material.

- Account Created (reg): Thursday, December 29, 2011 23:35:03 UTC
- Full Name: Manuel Argueta
- Alternate Email Address(es): manny_m2@yahoo.com (Verified)
- Phone: +15629863272 (Verified)[3]

c.      According to the Report, between May 1 and October 16, 2019, the Subject Account was accessed about 115 times – 67 of these times the Subject Account was associated with IP Address 76.175.192.88 ("IP Address 88").  Database checks showed that IP Address 88 was associated with Charter Communications.

d.      According to an administrative subpoena response from Charter Communications, IP Address 88 resolved back to the SUBJECT PREMISES with the subscriber (between January 2019 and November 2019) listed as Alejandra Pedraza.   California DMV records for ARGUETA list the SUBJECT PREMISES as his current address as of June 20, 2019.

e.      According to the Report, the phone number associated with the Subject Account was 562-986-3272.  T-Mobile subscriber information shows that phone number belongs to ARGUETA with the address 6044 Balfern Avenue, Lakewood, California.  That address, according to the California DMV, is ARGUETA'S previous address.

8.      According to the Report, 20 of the 115 times that the Subject Account was accessed between May 1 and October 16, 2019, it was associated with IP Address 74.62.218.186 ("IP Address 186").  Database checks showed that IP Address 186 was associated with Charter Communications.   According to an administrative subpoena response from Charter Communications, IP Address 186 resolved back to 159 North Wheeler Street, Orange,

---

[3] Verification typically involves a process in which the ISP sends an email to the registered email account and verifies that email when the subscriber responds to the ISP's email. As a result, the phone number and alternative email for the Subject Account were verified, but the name for the Subject Account was not.

California.  Public records show that this is the address of a non-profit organization called Olive Crest, which is dedicated to helping abused and neglected children.

9.      In February 2020, SA Timothy Alon accessed a publicly accessible Facebook account with the name of ARGUETA and photographs that match ARGUETA'S DMV photograph.  Based on this information, I believe this Facebook account belongs to ARGUETA. According to SA Alon, ARGUETA's Facebook page shows he previously worked at the Olive Crest location in Orange County, but as of late January 2020 he works at the Olive Crest location in Bellflower, California.  ARGUETA wrote the following on his Facebook page: "This is what I do for living with the Olive Crest's LA Wraparound Team at Bellflower."

10.      On February 27, 2020, FBI SA Christopher Kontsis told me that he conducted surveillance and said he observed ARGUETA leaving the SUBJECT PREMISES and enter a silver Honda with California license plate 7MQZ746, which DMV records show is registered to ARGUETA.  Based on the above information, there is a fair probability that ARGUETA owns and accesses the Subject Account (which contains 70 images of child pornography) and that between May 1 and October 16, 2019 he repeatedly accessed the Subject Account at his place of employment as well as the SUBJECT PREMISES.

## V.   TRAINING AND EXPERIENCE ON INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN

11.      Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that there are certain characteristics common to individuals with a sexual interest in children and images of children:

a.      Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive

poses, in person, in photographs, or in other visual media; or from literature describing such activity.

b.      Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides, and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.      Individuals who have a sexual interest in children or images of children sometimes possess hard copies of child pornography, such as pictures, films, video tapes, magazines, negatives, photographs, etcetera.  As digital technology has developed, individuals with a sexual interest in children or images of children have become much more likely to maintain child pornography in digital or electronic format, stored either on digital devices or in remote storage locations on the Internet.  Regardless of whether these individuals collect their child pornography in hard copy or digital format, they may maintain their child pornography for a long period of time, even years.  They usually maintain these collections in a safe, secure, and private environment, such as their homes, vehicles, or nearby, so they can view the child pornography at their leisure.  These collections are typically highly valued.

d.      Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors and collectors; may conceal such correspondence as they do their sexually explicit material; and often maintain lists of names,

addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

e.      Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

f.      Based on my training and experience, as well as my conversations with digital forensics agents, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via computer.  Electronic files downloaded to a hard drive can be stored for years at little to no cost. Even when such files have been deleted, they may be recoverable months or years later using readily available forensic tools.  When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and

computer habits.  Because computer evidence is recoverable after long periods of time, there is

probable cause to believe that evidence of activity related to the distribution, receipt,

advertisement, and possession and distribution of child pornography will be found at the

SUBJECT PREMISES or in a digital device on the person of ARGUETA.

### VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

12.      Based on my training, experience, and information from those involved in the

forensic examination of digital devices, I know that the following electronic evidence, inter alia,

is often retrievable from digital devices: Forensic methods may uncover electronic files or

remnants of such files months or even years after the files have been downloaded, deleted, or

viewed via the Internet.  Normally, when a person deletes a file on a computer, the data

contained in the file does not disappear; rather, the data remain on the hard drive until

overwritten by new data, which may only occur after a long period of time.  Similarly, files

viewed on the Internet are often automatically downloaded into a temporary directory or cache

that are only overwritten as they are replaced with more recently downloaded or viewed content

and may also be recoverable months or years later.

a.      Digital devices often contain electronic evidence related to a crime, the

device's user, or the existence of evidence in other locations, such as, how the device has been

used, what it has been used for, who has used it, and who has been responsible for creating or

maintaining records, documents, programs, applications, and materials on the device.  That

evidence is often stored in logs and other artifacts that are not kept in places where the user

stores files, and in places where the user may be unaware of them.  For example, recoverable

data can include evidence of deleted or edited files; recently used tasks and processes; online

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

b.     The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

c.     Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

13.     Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.     Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.     Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

14.     The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.     Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.     In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

15.     Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ARGUETA's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of ARGUETA's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. **CONCLUSION**

16.     For all the reasons described above, there is probable cause to believe that evidence of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography) and 2252A(a)(5)(B) (possession of child pornography) as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT PREMISES and on the person of ARGUETA as further described, respectively, in Attachments A-1 and A-2 of this affidavit.


_____
Brittany Radke, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this ___ day of February 2020.


_____
HONORABLE MICHAEL R. WILNER
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A-2**

**PERSON TO BE SEARCHED**

The person of Manuel Orlando ARGUETA, 25 years old, approximately 5'9," with black hair and brown eyes, depicted below:



The search of the aforementioned person shall include any and all clothing and personal belongings, including any digital devices, backpacks, wallets, briefcases and bags that are within ARGUETA's immediate vicinity and control at the location where the search warrant is executed.  It shall not include a body cavity or strip search.

**ATTACHMENT B**

**I.      ITEMS TO BE SEIZED**

1.      The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography), and 2252A(a)(5)(B) (possession of child pornography) (the "Subject Offenses"), namely:

a.      Child pornography, as defined in 18 U.S.C. § 2256(8);

b.      Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography;

c.      Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography, as defined in 18 U.S.C. § 2256;

d.      Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer or relate to any production, receipt, shipment, order, request, trade, purchase, or transaction of any kind involving the transmission through interstate commerce by any means, including by computer, of any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

e.      Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, identifying persons transmitting in interstate commerce,

including by computer, any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

f.      Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

g.      Any and all records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct.  Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings;

h.      Any records, documents, programs, applications, or materials identifying possible minor victims depicted in child pornography and/or minor victims of sexual abuse;

i.      Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to Yahoo! application;

j.      Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to accounts with any Internet Service Provider;

k.      Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership, habitation, and/or possession of the single-family residence located at 7818 Adwen Street, Downey, California 90044 (the "SUBJECT PREMISES");

l.      Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession and/or use of any digital device(s) found inside the SUBJECT PREMISES;

m.      Records, documents, programs, applications, materials, and files describing personal information not belonging to Manuel Orlando Argueta;

n.      Records, documents, and material relating to IP address 76.175.192.88;

o.      Records, documents, programs, applications, materials, and files relating to the deletion, uploading, and/or acquisition of victim files to include photographs, videos, e-mails, chat logs, or other files;

p.      Records, documents, programs, applications, materials, and files relating to the online social media accounts of any victim; and

q.      Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

r.      With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

i.      evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.      evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious

v

software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      iii.    evidence of the attachment of other devices;

      iv.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

      v.    evidence of the times the device was used;

      vi.    passwords, encryption keys, and other access devices that may be necessary to access the device;

      vii.    applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

      viii.    records of or information about Internet Protocol addresses used by the device;

      ix.    records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

      2.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

      3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop,

laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.     In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.     Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 120-day period without first obtaining an extension of time order from the Court.

b.     The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.     The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The

search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

    ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

    iii.    The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques**,** including to search for known images of child pornography.

    c.    If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

    d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

    e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

    f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of

the items to be seized (after the time for searching the device has expired) absent further court order.

    g.  The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

    h.  After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

   5.  This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

   6.  In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

    a.  Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

    b.  Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

       c.      Any magnetic, electronic, or optical storage device capable of storing digital data;

       d.      Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

       e.      Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

       f.      Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

       g.      Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

       7.      During the execution of this search warrant, law enforcement is permitted to: (1) depress Manuel Orlando Argueta's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Manuel Orlando Argueta's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

       8.      The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.